FILED

**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
***Ft. Myers Division***

2022 FEB 14 PM 2:29

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL]

*Plaintiffs*,

v.

[UNDER SEAL]

*Defendants*.

2:22-CV-98-JES-NPM

**Case No.** ________________

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).**

**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)**

**Jury Trial Demanded**


R. Scott Oswald
Janel Quinn
THE EMPLOYMENT LAW GROUP, P.C.
1717 K St., NW, Suite 1110
Washington, D.C. 20006
Telephone: 202-261-2806
Facsimile: 202-261-2835
Email: soswald@employmentlawgroup.com
Email: jquinn@employmentlawgroup.com

Scott Berman
Natasha M. Galvez
BERMAN NORTH
228 Hamilton Avenue, 3rd Floor
Palo Alto, California 94301
Telephone: 650.463.9488
Email: scott@bermannorth.com
Email: natasha@bermannorth.com

*Counsel for Plaintiff-Relator*

**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
***Ft. Myers Division***

UNITED STATES OF AMERICA, *ex rel.*
CHRISTOPHER FRIES

*Plaintiffs*,

v.

NEXTSTEP ARTHROPEDIX LLC

1800 Triplett Blvd
Akron, OH 44306

REGISTERED AGENT:

S&K Statutory Agent Services, Inc.
3475 Ridgewood Rd.
Akron, OH 44333

RANDY THEKEN

1100 Nola Ave.,
Coventry Township, OH 44203

*Defendants*.

**Case No. __________________**

**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).**

**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)**

**Jury Trial Demanded**

## INTRODUCTION

1. Relator Christopher Fries, on behalf of the United States of America, brings this action against Defendants NextStep Arthropedix LLC & its owner Randy Theken (collectively "Defendants") to recover damages and civil penalties arising from false or fraudulent statements and claims made, used, or caused to be made or used by Defendants in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*.

2. **Who**: NextStep Arthropedix LLC is an Ohio based company that operates across the United States and is owned and operated by Randy Theken. Defendants design, develop, and market orthopedic large joint implants. Surgeons across the country use NextStep products including the iNSitu Hip System™ (iNSitu) and Blade total hip arthroplasty implants.

3. **What**: To increase Medicare reimbursement, NextStep — through the direction of its owner Theken — marketed, sold, and caused to implanted in patients, non-FDA approved devices. It did so by misrepresenting the device's FDA status to hospitals and surgeons. As a result of this conduct, the claims submitted for payment for the Blade device to the Medicare program by Defendants and the unwitting hospital systems violate the False Claims Act. Additionally, NextStep, again at the direction of Theken, provided renumeration through the payment of royalties to surgeons based on a percentage of their net sales of NextStep's iNSitu hip system in violation of the Anti-Kickback Statute. Finally, NextStep received a Paycheck Protection Program ("PPP") loan in the amount of $492,000 in or around May 2020, by reporting a false of number of employees and then placed almost all of its employees on furlough with no pay indefinitely. Despite not using the PPP money to pay its employees as required by

the PPP, NextStep applied to and received forgiveness of its PPP loan in or around December 2020, in violation of the the False Claims Act.

4. **Where**: Defendants' illegal off label marketing practices occurred at hospitals located in Ohio, Florida, Pennsylvania, Arizona, and Oregon. Defendants are located in Ohio, which is where Theken directed NextStep staff to offer kickbacks to Drs. Robert Berghoff, Kurtis Biggs, Todd Borus, Michael Cannone, Sherwood Duhon, David Eichten, Mark Gittins, Ed Humbert, Christopher Nanson, Alexander Sah, Steve Thaxter, Thomas Thomas, and Michael Wilmink in the form of increased royalties based on volume. Theken also made, or caused to be made, false statement on NextSteps' PPP loan application and application for forgiveness.

5. **When**: Defendants violated the False Claims Act by billing for non-FDA approved femoral stems (The Blade) between December 17, 2018, and August 30, 2019. Defendants violated the False Claims Act by offering kickbacks to physicians from 2013 through the present. Defendants applied for a PPP loan on or about April 2020 and applied for forgiveness by falsely certifying that the PPP funds were used to pay payroll and other qualifying expenses in or around December 2020.

6. **How**: Defendants carry out their scheme by knowingly:

a. Misrepresenting the FDA approval status of the Blade femoral stem to surgeons.

b. Allowing non-FDA approved devices to be implanted in patients and subsequently billed to Medicare.

c. Assigning varying royalty percentages to physicians based on volume in an effort to induce surgeons to use NextStep products.

d. Applying for forgiveness of PPP loan funds that were not used for appropriate expenses, such as payroll. Defendants falsely reported the number of employees, then placed almost all its employees on furlough on March 16, 2020 and made no further payroll payments until August 2020.

## PARTIES

7. **Relator Christopher Fries** is a U.S. citizen and resident of San Luis Obispo County, California. Fries has worked in medical device sales since 2005 and is knowledgeable about medical implant design and sales. From approximately October 2013 to August 6, 2020, Fries was employed by Defendant NextStep as Vice President. As Vice President, Fries provided various executive services including sales, product development, and managing the engineering and Surgeon Design Teams ("SDT"). Fries was initially introduced Theken in late 2012 and subsequently met Theken in person in January 2013 to discuss starting a company to design hip, knee, and spine prothesis.

8. **Defendant NextStep Arthropedix LLC** is an Ohio limited liability company formed by Defendant Theken, Gregg May, and Fries in early 2013 to to design hip, knee, and spine prosthetics. NextSteps is headquartered in Ohio and its corporate office is located at 1800 Triplett Boulevard, Akron, Ohio 44306. NextStep provides services across the country to include Florida, California, Oregon, Oklahoma, Arkansas, Arizona, New Jersey, Pennsylvania, Georgia, Texas, and Ohio. Additionally, NextStep employees are employed throughout the country. Through its owner, Theken, NextStep manages and conducts the scheme to present false claims alleged in this case. At its corporate office, Defendants also prepare and submit

false claims for payment for services provided across the country and prepared and submitted the false claims for loan forgiveness under the PPP.

9. **Defendant Randy Theken** is the sole owner of Defendant NextStep. He calls himself the founder of the company and currently acts as the President and Chief Executive Officer. Theken is in charge of all operations at NextStep.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) as the alleged misconduct took place in this jurisdiction and 28 U.S.C. § 1331 as this action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

11. This Court has personal jurisdictions over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants have at least minimum contacts with the United States, and can be found in, transact, or have transacted, business in this District.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because the complained of illegal acts giving rise to this action occurred within this judicial district and because Defendants can be found in, transact, or have transacted, business in this district.

13. The specific facts, circumstances, and allegations of Defendants' violations of the federal False Claims Act has not been publicly disclosed in a civil suit, criminal suit, or administrative civil money penalty proceeding in which the government is already a party.

## PROCEDURAL HISTORY

14. Relator Christopher Fries is the original source of all the information upon which this Complaint is based, as that phrase is used in the federal False Claims Act. There has been no public disclosure of the allegations contained in this Complaint.

15. To the extent that any such disclosure has been made, such disclosure is unknown to Relator and Relator remains the "original source" under 31 U.S.C. § 3730(e)(4).

16. Relator has direct and independent knowledge of the information on which the allegations herein are based and voluntarily provide this information to the United States prior to filing this action as required by 31 U.S.C. § 3730(e)(4).

## LEGAL BACKGROUND

### A. Federally Funded Healthcare Programs

#### 1. Medicare Program

17. In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. § 1395, *et seq*. ("the Medicare Program" or "Medicare") authorizing the federal Government to pay for the cost of certain medical services for persons 65 years or older, disabled individuals, or patients with end-stage renal disease.

18. The United States, through the Department of Health and Human Services ("HHS"), and specifically the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare program which now has four parts: Part A covers inpatient hospital treatment; Part B is traditional medical insurance that covers outpatient doctors' services and care; Part C is Managed Care Plans managed by private insurance providers; and Part D provides prescription drug coverage.

19. Medicare Parts A and B are "original" or "traditional" Medicare. Medicare Part C, also called Medicare Advantage, provides "traditional" Medicare coverage paid for by the Medicare program but managed by private healthcare plans.

20. Medicare reimbursement to providers of medical services is accomplished through private insurance carriers, as provided by 42 U.S.C. § 1395u. The carrier, on behalf of the Medicare Program, reviews and approves claims submitted for reimbursements by Medicare providers.

21. Although the Medicare contractor is checking for errors, the certifying physician or supplier is ultimately responsible for the accuracy of the information upon which the claim is based.

22. Medical treatment and services by physicians are generally reimbursable under the Medicare Program if the services provided are "economically and only when, and to the extent, medically necessary." *See* 42 U.S.C. § 1320c-5(a).

23. Federal law prohibits providers from making "any false statement or representation of a material fact in any application for any . . . payment under a federal healthcare program." *See* 42 U.S.C. § 1320a-7(B)(A)(1).

24. Medicare, including Medicare Parts A, B, and C plans cover, and provide reimbursement for joint replacements depending on the status of the beneficiary.

**2. TRICARE**

25. TRICARE is a federally funded health care program for current and former uniformed service members and their families. TRICARE is administered by the Department of

Defense ("DOD") and provides healthcare coverage for military personnel, military retirees, and their dependents.

26. TRICARE covers, and provides reimbursement for, joint replacements.

**B. Paycheck Protection Program**

27. The Paycheck Protection Program ("PPP") is a federal loan program designed in part to provide a direct incentive for employers to keep employees on payroll during the economic crisis caused by the COVID-19 pandemic. *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, tit. I, § 1102 (2020).

28. The PPP was established as part of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

29. The CARES Act was signed into law on March 27, 2020.

30. The CARES Act is a $2 trillion economic relief package designed to provide swift and direct economic assistance for individuals and businesses due to the economic and financial effects of the COVID-19 pandemic.

31. The PPP is administered through the Small Business Administration (SBA).

32. Businesses seeking a PPP loan can apply through any existing SBA 7(a) lender, through a federally insured depository institution or credit union, or through a participating Farm Credit System institution. *Id.*

33. The foregoing private institutions approve and authorize PPP loans, and then are subsequently reimbursed by the federal government. *Id.*

34. When applying for the loan, a business must certify the reason it needs the loan are proper and must provide an accounting statement of payroll and other acceptable costs in order to calculate the amount requested. *See Id.* at § 1106.

35. Specifically, the business must certify that "the funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments and utility payments." *Id.* at § 1102(G)(i).

36. Lenders need to confirm receipt of borrower certifications; confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020; confirm the dollar amount of average monthly payroll costs; and follow applicable Bank Secrecy Act requirements. Lenders are permitted to rely on borrower certifications and representations. *See* PPP Information Sheet, Lenders. https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

37. The SBA guarantees 100% of the outstanding balance, and that guarantee is backed by the full faith and credit of the United States. *Id.*

38. For its work to process the application and fund the loan, the SBA pays the lender a processing fee based on the size of the loan funded by the lender. SBA will pay lenders fees for processing PPP loans in the following amounts: Five (5) percent for loans of not more than $350,000; Three (3) percent for loans of more than $350,000 and less than $2,000,000; and One (1) percent for loans of at least $2,000,000. *Id.*

39. Once a PPP loan is obtained, a business can file for full loan forgiveness, provided it adheres to the requirements set out in the CARES Act.

40. The PPP applicant must also certify that the information it provides in the application and in the supporting documentation for forgiveness is accurate.

41. To receive full loan forgiveness, the business must use at least 60% of the PPP money on payroll and may use the remaining portion of the loan on other qualifying costs, such as rent, utilities, and mortgage interest.

42. Businesses must also adhere to the following requirements to see loan forgiveness:

a. The business must spend the loan within 24 weeks of receiving it.

b. The business must have the same employee count when applying for full forgiveness as it did when it applied for the loan.

c. The business must not reduce employees' wages by more than 25% for all employees who earned less than $33,333 between March 1, 2019 and June 30, 2019 or earned $100,000 or less in 2019. *See Id.* at § 1102 (a); *see also* Paycheck Protection Program Flexibility Act, Pub. L. No. 116-142, § 3(b) (2020).

43. To determine if a business reduced employees' salaries by more than 25%, the SBA compares the average annual salary or hourly wage, rather than the total wages amount.

44. A business can reduce its workforce and still receive full PPP loan forgiveness if the reductions meet any of the following exceptions:

a. Employees who were laid off and were then re-offered employment declined to return to work;

b. Employees voluntarily resigned;

c. Employees were terminated with cause;

d. Employees requested and received a reduction in hours;

e. The business can document in good faith an inability to return to the same level of business activity as the business was operating at before February 15, 2020 due to compliance with federal agency requirements or guidance issued after March 1, 2020. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Forgiveness and Loan Review Procedures Interim Final Rules, 85 Fed. Reg. 38,308 (June 26, 2020).

45. When applying for loan forgiveness, a business must submit documentation demonstrating that the loan was spent properly according to SBA guidelines.

46. Borrowers may submit a loan forgiveness application any time before the maturity date of the loan, which is either two or five years from loan origination. However, if a borrower does not apply for loan forgiveness within 10 months after the last day of the borrower's loan forgiveness covered period, loan payments are no longer deferred, and the borrower must begin making payments on the loan. For example, a borrower whose covered period ends on October 30, 2020 has until August 30, 2021 to apply for forgiveness before loan repayment begins.

47. If a business knowingly makes false certifications on the PPP loan application and receives a PPP loan, then the business is in violation of the False Claims Act.

48. If a business receives a PPP loan, submits a loan forgiveness application, and knowingly makes false certifications on the loan forgiveness application, then the business is in violation of the False Claims Act.

49. At all times herein mentioned, Defendants had knowledge of the public policies expressed in the guidelines herein mentioned, and of the fact that they must comply with all applicable SBA guidelines in order to receive a PPP loan and to apply for full forgiveness of a PPP loan.

**C. Applicable Laws**

**1. The Federal False Claims Act**

50. The False Claims Act ("FCA") prohibits knowingly presenting, or causing to be presented, to the federal Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1). In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA also prohibits conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid by the Government. 31 U.S.C. § 3729(a)(1)(C).

51. The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

52. Any person who violates the FCA is liable for civil penalties up to $11,000 per false claim prior to November 2, 2015, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions. 31 U.S.C. § 3729(a).

These civil penalties increase to up to $21,563 per false claim for claims submitted to the Government after November 2, 2016, and including treble damages. 28 C.F.R. § 85.5.

53. The Eleventh Circuit recognizes the material elements of fraud under the False Claims Act as: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015).

**2. The Federal Anti-Kickback Statute.**

54. The Anti-Kickback Statute ("AKS") was designed to prevent conflicts of interest arising between and among referral sources and other health care providers and entities. 42 U.S.C. § 1320a-7b(b).

55. The AKS prohibits a person or entity from "knowingly and willfully" paying remuneration to another person or entity to induce the recipient to, *inter alia*, refer an individual to a person or entity for the purpose of furnishing a service or item paid for by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

56. A person found to have violated the AKS is subject to criminal and civil sanctions, including exclusion from participation in federal health care programs. 42 U.S.C. §§ 1320a-7b(b)(1)–(2), 1320a-7a(a)(7), 1320a-7(b)(7).

57. The AKS prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of federal health care business. The AKS prohibits the offer or payment of "anything of value" in return for referrals. A "thing of value" is defined broadly to include payment in cash or kind.

58. The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals. The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to over-utilization.

59. In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to a Federal Health Care Program (including Medicare, Medicaid, or TRICARE) any claim for referrals that are induced by kickbacks.

60. In 2010, the Patient Protection and Affordable Care Act of 2010 amended the AKS to clarify that a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a–7b(g).

61. Compliance with the AKS is a condition of payment for government insurance programs.

62. The Advanced Medical Technology Association ("AdvaMed") represents companies that develop, produce, manufacture, and market medical products and technologies, such as NextStep.

63. AdvaMed has developed a Code of Ethics to govern the interactions between medical technology companies and health care providers to ensure that their interactions are conducted with appropriate transparency and in compliance with applicable laws, regulations, and government guidance to ensure that medical decisions are based on the best interests of the patient. The principles of the Code are derived from a variety of authorities, including the federal Anti-Kickback Statute.

64. The AdvaMed Code of Ethics directly addresses the requirements of compliance with the AKS by referring "to the concept of an 'unlawful inducement' to reflect the prohibitions found in the U.S. Federal Anti-Kickback Statute" throughout the Code. *See* July 20, 2020 AdvaMed Code of Ethics at p. 4.

65. AdvaMed's Code of Ethics makes clear that medical technology companies such as NextStep "should enter into a royalty arrangement with a Health Care Professional only where the Health Care Professional is expected to make or has made a novel, significant, or innovative contribution to, for example, the development of a product, technology, process, or method."

**INSITU AND BLADE BACKGROUND**

66. NextStep developed the iNSitu Hip System™ (iNSitu) between October 2013 to October 2016 as a total hip arthroplasty system which included a femoral stem component, a femoral head component, an acetabular liner component, an acetabular cup component, and an acetabular screw component as options. A total hip arthroplasty is more commonly referred to as a hip replacement, which is a surgical procedure in which the hip joint is replaced by a prosthetic implant.

67. NextStep received FDA approval for the iNSitu through a 510k on or around October 14, 2016, and began marketing the device to surgeons for implantation.

68. With few limited exceptions that are not applicable here, FDA approval is required for DME to be reimbursed by CMS. *See* Medicare Benefit Policy Manual, Chapter 14 – Medical Devices, at 10 – Coverage of Medical Devices (Rev. 198, 01-05-15).

69. In response to suggestions of surgeons using the iNSitu, and surgical technique clarifications regarding the proper angle of entry for the device's femoral stems, NextStep began

to develop a new stem that would be compatible with the iNSitu cup, called the Blade, in or around 2018.

70. The Blade is a femoral stem designed to be used with the iNSitu Hip System™, however, it is a separate stem implant with a different design and materials.

71. As such, the Blade required a separate FDA approval process and could not be added under the iNSitu Hip System™ FDA approval.

72. The Blade went into manufacturing in the third quarter of 2018, and Theken subsequently provided the device to surgeons for unauthorized trialing on patients.

73. Theken did not inform surgeons that the Blade had not yet received FDA approval.

74. Approximately 65 Blade devices were implanted in patients from December 2018 through August 2019, prior to FDA approval.

## FACTUAL ALLEGATIONS

### A. Off Label.

75. The iNSitu Hip System™ was FDA approved on or about October 14, 2016, and NextStep began marketing the iNSitu to surgeons around that time.

76. In its first year, the iNSitu Hgenerated approximately $3 million in revenue for NextStep.

77. In late 2017, many surgeons stopped using the iNSitu device due to complications.

78. For example, the screws holding the device in place were becoming dislodged and free floating in the patients' pelvis due to their ability to "slip" through the acetabular cup component.

79. Cowan Moore, NextStep's Chief Technology Officer, ultimately determined in mid-2017 that the reason for the screws dislodging was related to a design flaw in the acetabular cup, and the angle at which the screws were inserted.

80. As a result of this discovery, NextStep should have changed the acetabular cup design flaw, and updated its surgical technique instructions to surgeons. However, to date that guidance has not been updated to include any instructions regarding the angle of insertion.

81. NextStep then began developing the Blade to be used in conjunction with the INSitu system.

82. The hope was that the Blade would replace the iNSitu Stem and restore the surgeons' trust in NextStep and in turn provide NextStep with needed revenue.

83. Development of the Blade occurred at the end of 2017 and throughout 2018. Drs. Humbert and Briggs were consulted regarding the design. The first Blade implants were available in November 2018.

84. In or around the summer of 2018, during a design meeting Theken told those present including Fries, Garrett Spurgeon (Director of Product Development at the time), and several engineers, including Tom Falencki, Rich Barros, and Kurt Titmas that he intended to roll out the Blade stem but continue to market it as part of the iNSitu stem until the Blade got FDA approval.

85. Theken explained that he intended to roll out the Blade stem for implantation prior to FDA approval because of considerations of time and money. Essentially, many surgeons had stopped using the iNSitu Hip System™ due to complications resulting from the design features of the iNSitu Femoral Stem. This was the impetus for the development of the Blade

stem. Theken wanted to release the product quickly in order to restart sales of the iNSitu Hip System™.

86. Everyone present at the meeting opposed Theken's plan, however, everyone was afraid to push back against his instructions for fear of losing their jobs. Theken had a pattern of belittling, humiliating, shouting, or otherwise verbally abusing his employees.

87. No surgeons, operating room staff, or NextStep sales representatives were aware that the Blade had not received FDA approval when it was rolled out. Marketing materials were drafted to imply that the Blade was a part of the iNSitu Hip System™ by using several code names.

88. For example, in an internal management review slide deck, NextStep refers to "the iNSitu Hip System™ & Project Beryllium." The Project Beryllium is the Blade device.

89. Other materials referred to the Blade as a "dual taper." For reference, the iNSitu stem is actually a quad taper.

90. The packaging for the Blade device was changed from purple to orange to mirror the iNSitu packaging and make it appear as part of the iNSitu Hip System™.

91. Additionally, NextStep created marketing materials showing the Blade being used as a part of the iNSitu Hip System™. The flyer has NextStep's logo and the "iNSitu Hip System™" in large font accompanied by an image of the Blade and the iNSitu Hip System™, with no written reference to the Blade as a separate component.

92. Co-Founder of NextStep and President and CEO at the time, Gregg May sent letters to various hospitals that used the iNSitu Hip System™ stating that the Blade was a line extension as part of the iNSitu Hip System™ and that NextStep would add the device to its

pricing and billing schedule. These letters were accompanied by a copy of the 510k FDA approval form for the INSitu device, improperly insinuating that the Blade had received approval under that form.

93. On or around December 17, 2018, Dr. Edward Humbert in Fort Myers, Florida performed a total hip arthroplasty on Patient 1[1] using an FDA approved iNSitu cup with the non-FDA approved Blade stem for the first time. Dr. Humbert was totally unaware that the Blade stem being used was a not FDA approved device.

94. Patient 1, a Medicare beneficiary, was also unaware that the Blade stem being implanted was not FDA approved.

95. Garrett Spurgeon, Director of Product Development, and Sean Baker, an independent representative from NextStep were present at the surgery. Spurgeon was aware the device was not FDA approved, but Baker was not.

96. Unfortunately, Patient 1's initial implant did not work, and the hardware was deemed to have a suboptimal fit. As a result, Dr. Humbert had to perform a lengthy revision of the total hip arthroplasty on Patient 1 later that same day. A revision requires a patient to be put back under anesthesia, have the hardware that was implanted into their bones removed, and have new hardware reimplanted. This is a costly and dangerous procedure for the patient.

97. NextStep failed to file the required Manufacturer and User Facility Device Experience (MAUDE) report as required by the FDA for device malfunctions.[2]

---

[1] The names of the Patients identified in this Complaint are known to Relator and can be provided to the Court, The United States, and the Defendant as appropriate.

[2] The FDA uses MAUDE reports to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of these products. The MAUDE database houses MDRs submitted to the FDA by mandatory reporters. Manufacturers and importers must submit reports when they become aware of information that reasonably suggests that one of their marketed devices may have caused or contributed to a death or serious

98. Between December 17, 2018, and August 30, 2019, NextStep allowed surgeons to perform approximately 65 total hip arthroplasty procedures with an INSitu cup and a non-FDA approved Blade stem. For examples:

a. Dr. Calderon performed a total hip arthroplasty using the Blade on Patient 2 at Phoenix, Arizona on or around December 17, 2018. Jamie Sease, a NextStep field engineer, attended this surgery.

b. Dr. Thomas Bear performed a total hip arthroplasty using the Blade on Patient 3 at Akron, Ohio on or around December 18, 2018. Sease also attended this surgery.

c. Dr. Michael Wilmin performed a total hip arthroplasty using the Blade on Patient 4 in Phoenix on or around December 18, 2018.

d. Dr. Kurtis Biggs performed a total hip arthroplasty using the Blade on Patient 5, in Naples, Florida LOCATION in or around January 2019

e. Dr. David Eichten performed a total hip arthroplasty using the Blade on Patient 6, in Fort Myers, Florida on or around March 19, 2019.

f. Dr. Ed Stolarski performed a total hip arthroplasty using the Blade on Patient 7, in Sarasota, Florida on or around January 9, 2019.

99. Defendants ultimately received a 510K FDA Approval Letter for the Blade Stem on or around August 30, 2019.

---

injury or has malfunctioned and the malfunction of the device or a similar device that they market would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. Manufacturers must send reports of such deaths, serious injuries, and malfunctions to the FDA. Importers must send reports of deaths and serious injuries to the FDA and the manufacturer, and reports of malfunctions to the manufacturer.

100. The national average selling price of the iNSitu Hip System™ using the Blade is $4,800, but the specific agreements with hospitals range between $3,800 and $7,000 depending on the negotiated rates negotiated.

101. Medicare reimburses a bundled rate of approximately $31,000 per hip surgery, which includes the cost of the implants, anesthesia, facility fees, disposables, and other associated costs.

102. Between December 17, 2018, and August 30, 2019, NextStep's actions resulted in approximately 65 claims for payment from Medicare, Medicaid, and TRICARE for the implantation of non-FDA approved Blade stems.

103. The implantations continued despite surgeons being unsure of the effectiveness of the device.

104. For example, on February 25, 2019, Gregg May stated in a text message that a surgeon, Dr. Biggs, had sent him the following message: "The jury is still out on the blade for me. I am not very fond of the butt that remains in the larger sizes. When it is combined with the reduced taper, I feel it abuts the lateral edge and may cause the continued pain of the upper femur despite good fixation. I have four implants in and two look good and two look like they have subsided slightly. No one is having unexpected pain but the longest post op is one month. I will continue to follow them on a monthly basis over the next few months. The head trial needs to be addressed so it can come off more easily. I have had one stem sit at the broach level, two at the one mm proud and one stem 4-5 mm proud."

105. May then indicated that NextStep would need to conduct further testing and analysis to address those concerns.

106. No further testing or analysis occurred.

107. May was terminated for unrelated reasons in or around early April 2019.

**B. Kickbacks**

108. When developing the iNSitu stem and cup, NextStep worked closely with surgeons to create a device that was cutting edge and appealing to surgeons. These surgeons included Drs. Robert Berghoff, Kurtis Biggs, Todd Borus, Michael Cannone, Sherwood Duhon, David Eichten, Mark Gittins, Ed Humbert, Christopher Nanson, Alexander Sah, Steve Thaxter, Thomas Thomas, and Michael Wilmink.

109. As is common in the industry, these contributing surgeons were compensated for their expertise in part with royalty payments from NextStep based on a percentage of iNSitu hardware sold in the future.

110. Royalty payments are appropriate and legal under the Anti-Kickback Statute as long as the contributing surgeon (or other healthcare professional) is expected to make or has made a novel, significant, or innovative contribution to, for example, the development of a product, technology, process, or method.

111. A company should base the calculation of royalties payable to a health care professional in exchange for Intellectual Property on factors that preserve the objectivity of medical decision-making and avoid the potential for improper influence. *See* https://www.advamed.org/wp-content/uploads/2021/05/AdvaMed-Code-of-Ethics-2021.pdf at p 11.

112. NextStep originally offered contributing surgeons a varying royalty arrangement based on separate and private offers from Theken ranging between 0.25% and 1.25%.

113. However, in or around mid-2016, Dr. Gittins became upset with NextStep regarding his rate and threatened to take his business to another supplier.

114. In response, Theken and May met with Dr. Gittins various times in 2016 and offered to increase his royalty rate to 1.25% effective November 8, 2016.

115. This increased royalty payment was not based on Dr. Gittins' legitimate contribution to the development of the iNSitu. Instead, Dr. Gittins' increased royalty payment was offered by NextStep, through Theken and May, to induce Dr. Gittins to continue to use the iNSitu product in his total hip arthroplasty procedures which were subsequently billed to the Medicare and Tricare programs.

116. Further, all of the surgeons using the iNSitu hip system were provided a different percentage of royalty payments based on the volume of their surgical practice

117. The difference in royalty payments to surgeons should not be based on the volume of the devices they implant. It should be based on their participation in the development, which should have been, and certainly was in this case, equal. As such, all surgeons should have received the same offer and payments.

118. For example, NextStep's surgeon royalty schedule indicates various royalty percentage agreements for various physicians:

a. Dr Robert Berghoff receives a 1% royalty

b. Dr. Biggs receives a 0.5% royalty

c. Dr. Borus receives a 0.5% royalty

d. Dr. Cannone receives a 0.5% royalty

e. Dr. Duhon receives a 1% royalty

f. Dr. Eichten receives a 0.5% royalty

g. Dr. Gittins receives a 1.25% royalty

h. Dr. Humbert receives a 2% royalty

i. Dr. Nanson receives a 1% royalty

j. Dr. Sah receives a 1% royalty

k. Dr. Thaxter receives a 0.5% royalty

l. Dr. Thomas receives a 0.25% royalty

m. Dr. Wilmink receives a 1.25% royalty

n. Dr. Zartman receives a 0.25% royalty

119. Except for Dr. Gittins, all the agreements were reached and signed in 2013, at the outset of the iNSitu project. The royalty schedule indicates that Dr. Gittins's agreement was amended in 2016 after he complained to Theken and May and threatened to stop using the INSitu system.

120. Following the pandemic, Theken decided to review the surgeon's sales volume and decided to stop paying royalties to the surgeons. While he did not cancel their contracts, he told Fries that he intended to stop paying the lower volume surgeons any royalties at all.

### C. PPP Fraud

121. In or around early March 2020, as COVID-19 was emerging in the United States, Theken began to worry about the potential impact of the virus on the healthcare industry and NextStep in particular.

122. On or about March 15, 2020, Theken sent a text message to then President Farzin Khaghani directing Khaghani to deny any future Paid Time Off for employees because he was concerned about the virus and the future of the business.

123. On or about March 16, 2020, Theken announced that he was suspending all operations for NextStep and furloughing all employees via a companywide phone call.

124. Nevertheless, Theken required the following NextStep employees to continue to work without pay: Fries; Garrett Spurgeon, now the Vice President of Engineering; Rich Gray, Area VP for the Western Region; and Scott Mains, Area VP for the Northeast Region.

125. On or about April 9, 2020, NextStep was approved for a first round PPP loan in the amount of approximately $492,000 by CFBank, National Association. *See* https://projects.propublica.org/coronavirus/bailouts/loans/nextstep-arthropedix-llc-9027147002.

126. Based on this loan amount, CFBank, National Association received a loan processing fee in the amount of $ 14,760 for processing NextStep's PPP loan.

127. Despite receiving nearly half a million dollars to fund payroll for NextStep employees, Theken did not offer to re-employ any of the furloughed employees through the spring and summer of 2020. Theken also refused to pay the handful of employees who continued to work for NextStep unpaid.

128. Theken viewed the furlough as an opportunity to "clean house" and let go individuals he did not like.

129. In a call on March 17, 2020, Theken told Fries he specifically did not intend to bring back then President, Khaghani.

130. In calls throughout Spring 2020, Theken discussed what he would call "draft picks," namely, which employees he wanted to bring back and when, and which employees he did not intend to bring back at all.

131. NextStep sent several furlough extension notices to employees between March 2020 and July 2020 and refused to let employees return to work during this time, except for those employees who Theken required to work without pay.

132. Additionally, Defendants did not pay payroll to any of the employees who continued to work for NextStep during the spring and summer of 2020, including Fries.

133. Fries ceased being a NextStep employee on or about August 6, 2020.

134. NextStep allowed four of its approximately 35 employees to return to work at the end of August 2020.

135. Despite not paying any payroll from the period of March 17, 2020, to September 2020, NextStep applied for forgiveness of its entire PPP loan.

136. NextStep's forgiveness application was approved on or about December 2020. Ultimately, NextStep had its entire $498,376 loan plus interest forgiven.

137. Fries believes the PPP funds were spent on NextStep's outstanding debts.

**COUNT I**
**Violation of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)**
**As to All Defendants**

146. Relators incorporate the allegations contained in paragraphs 1 through 137 as if set forth in full herein.

147. 31 U.S.C. § 3729(a)(1)(A) provides liability for any person who knowingly presents, or causes to be presented, to an officer or employee of the United States a false or fraudulent claim for payment or approval.

148. Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States through the Medicare and TRICARE programs when they submit, and cause to be submitted, claims for implanting devices they knew were off label, and payment for devices they knew were not FDA approved.

149. The Anti-Kickback Statute deems a claim that results from an unlawful kickback to be a violation of 31 U.S.C. § 3729(a), providing that "a claim that includes items or services resulting from a violation of this section [42 U.S.C. § 1320a-7b] constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31." 42 U.S.C. § 1320a-7b(g).

150. Defendants knowingly presented or caused to be presented false and fraudulent claims for payment or approval to the United States through the Medicare and TRICARE programs when they submit, and cause to be submitted, claims for surgeries using the iNSitu hip system services that are induced by an illegal kickback relationship.

151. Additionally, Defendants submitted, or caused to be submitted false claims for payment to the government when NextStep falsely certified that it intended to use it's PPP money to pay payroll for employees on its PPP application, and subsequently certified that it did use it's PPP funds for payroll and other authorized uses on its application for forgiveness.

152. Defendants knew these claims for payment to the government were false or fraudulent as defined by the FCA.

153. The United States, unaware of the falsity of the claims made by Defendants or caused to be made by Defendants, and in reliance on the accuracy of those claims, paid, and is continuing to pay for non-FDA approved devices, illegally induced iNSitu procedures for Medicare and TRICARE beneficiaries, and forgave NextStep's PPP loan.

154. Had the United States known Defendants were billing for services that were not FDA approved and illegally induced it would not have paid those claims. Additionally, had the United States known Defendants PPP application and application for forgiveness were false, it would not have forgiven NextStep's PPP loan.

155. As a result of the false or fraudulent claims presented or caused to be presented by Defendants, the United States has suffered damages, in an amount to be determined at trial.

**COUNT II**
**Violation of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(B)**
**As to All Defendants**

156. Relators incorporate the allegations contained in paragraphs 1 through 137 as if set forth in full herein.

157. 31 U.S.C. § 3729(a)(1)(B) provides liability for any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

158. Defendants knowingly made, or caused to be made, false records or statements material to a false, or fraudulent claims when they falsely represented that the Blade stem was FDA approved and therefore reimbursable by the Medicare and TRICARE programs, and when Defendants falsely certified NextStep intended to use PPP funds to pay payroll and other qualifying expenses.

159. Defendants knew these statements and records were false.

160. The United States, unaware of the falsity of the statement or records in support of the false claims made by Defendants or caused to be made by Defendants, and in reliance of the accuracy of those statements and records, reimbursed claims for implanting the non-FDA approved Blade for Medicare and TRICARE beneficiaries, and paid CFBank, National Association a loan processing fee in the amount of $ 14,760.

161. Had the United States known Defendants were billing for services that were supported by false records or statements, it would not have plaid those claims.

162. Because of these false or fraudulent claims presented or caused to be presented by the Defendants, the United States has suffered damages, in an amount to be determined at trial.

**COUNT III**
**Violation of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C)**
**As to All Defendants**

163. Relators incorporate the allegations contained in paragraphs 1 through 137 as if set forth in full herein.

164. In part, 31 U.S.C. § 3729(a)(1)(C) provides liability for any person who conspires to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

165. Defendants, in their agreements and conduct engage in a concerted effort to carry out the scheme to bill for services that are illegally induced and improperly billed conspired to defraud the United States by submitting false or fraudulent claims to the Medicare and TRICARE programs which are paid by the United States.

166. The United States, unaware of the conspiracy by Defendants to defraud the United States by submitting false or fraudulent claims to the Medicare and TRICARE programs,

and in reliance of the accuracy of those claims, paid, and is continuing to pay for claims submitted in violation of 31 U.S.C. § 3729(a)(1)(C).

167. Had the United States known Defendants were conspiring to defraud the United States, it would not have plaid those claims.

168. Because of these false or fraudulent claims presented or caused to be presented by the Defendants, the United States has suffered damages, in an amount to be determined at trial.

**PRAYER FOR RELIEF.**

WHEREFORE, Relator, on behalf of himself and the United States are entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729–3733, and Relator requests that judgment be entered against Defendants, as follows:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b. Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendant of not less than $5,000 and not more than $11,000 (or in such other amount as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 pursuant to 31 U.S.C. § 3729(a)(1)) for each violation of 31 U.S.C. § 3729, and prejudgment interest;

c. United Stated be awarded all reasonable costs incurred in bringing this action;

d. That Relator be awarded all costs incurred, plus reasonable attorneys' fees and expenses, in accord with 31 U.S.C. § 3730(d);

e. That, in the event the United States elects to intervene in and proceed with this action, Relator be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1);

f. That, in the event that the United States does not proceed with this action, Relator be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2);

g. That, pursuant to 31 U.S.C. § 3730(c)(5), Relator be awarded a share of any alternate remedy that the United States elects to pursue; and

h. The United States and Relator be granted all such other relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demand a jury trial on all claims alleged herein.

Dated: February 14, 2022

Respectfully submitted,

*/s/ R. Scott Oswald*

R. Scott Oswald (Florida Bar No. 158437)
Janel Quinn (to be admitted *pro hac vice*)
THE EMPLOYMENT LAW GROUP, P.C.
1717 K St., NW, Suite 1110
Washington, D.C. 20006
Telephone: 202-261-2806
Facsimile: 202-261-2835
Email: soswald@employmentlawgroup.com
Email: jquinn@employmentlawgroup.com

Scott Berman (to be admitted *pro hac vice*)
Natasha M. Galvez (to be admitted *pro hac vice*)
BERMAN NORTH
228 Hamilton Avenue, 3rd Floor
Palo Alto, California 94301
Telephone: 650.463.9488
Email: scott@bermannorth.com
Email: natasha@bermannorth.com

*Counsel for Relator*