UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,
ex rel. CHRISTOPHER FRIES,

Plaintiffs,

v.

Case No. 2:22-cv-98-KCD-NPM

NEXTSTEP ARTHROPEDIX, LLC,
and RANDY THEKEN

Defendants,
_______________________________/

**ORDER**

Relator Christopher Fries claims that Defendants NextStep Arthropedix, LLC and Randy Theken devised a kickback scheme which netted them millions in ill-gotten gains at the government's expense. Seeking to help Uncle Sam recoup his losses, Fries brings this qui tam action under the False Claims Act, 31 U.S.C. § 3729. Defendants now move to dismiss the case (Doc. 43) and Fries has responded (Doc. 63), making this matter ripe.[1] As explained below, Defendants' motion is **DENIED**.

## I. Background

Here are the relevant facts taken from the operative complaint, which at this stage must be taken as true. NextStep is a medical-device company which "design[s] hip, knee and spine prosthetics." (Doc. 35 ¶ 6.) Theken is

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

NextStep's "sole owner," founder, and "currently acts as [its] President and Chief Executive Officer." (*Id.* ¶ 7.) Fries worked as NextStep's Vice President from October 2013 to August 2020. (*Id.* ¶ 5.)

In 2013, NextStep developed "a total hip arthroplasty system used in hip replacement surgeries." (*Id.* ¶ 47.) We'll refer to this simply as "the System." Later that year, NextStep began forming a "Surgeon Consultant Team" consisting of surgeons "who regularly perform hip replacement surgeries." (*Id.* ¶ 48.)

These surgeons inked deals with NextStep that purportedly paid them royalties for their help developing the System. (*Id.*) Their deals required the surgeons to submit written reports of their contributions and attend "substantially all" of NextStep's "design and development meetings." (*Id.* ¶ 49ii.) In exchange, they received royalty checks "in an amount equal to" a fixed percentage of the net sale price "for each product sold." (*Id.*) And therein lies the rub.

Fries says the royalty rates were set based on each surgeon's "expected order volume" of NextStep's Systems. (*Id.* ¶ 52.) Surgeons "who were expected to order more" Systems for their patients' surgeries enjoyed "higher royalty percentages." (*Id.*) Meanwhile, all surgeons were "expected to provide" identical services "and participate in the same number of meetings." (*Id.* ¶ 51.) The payout, in other words, was tethered to anticipated sales volume

rather than design work. So, as Fries tells it, NextStep hatched an elaborate kickback scheme disguised as a product-development program. (*Id.* ¶ 52.)

But that's only half of it. Fries says Medicare paid for thousands of surgeries involving NextStep's devices. (*Id.* ¶ 73.) Providers seeking "payment from federally funded healthcare programs" (like Medicare) must certify their compliance with the federal Anti-Kickback Statute. (*Id.* ¶ 27.) And the Anti-Kickback Statute bars knowingly offering or paying "any renumeration . . . in exchange for referring, recommending, or arranging for federally funded medical services." (*Id.* ¶ 19.) Thus, the theory goes, NextStep caused a false claim to be submitted to and paid by the government every time these surgeons billed Medicare for a System-involved surgery. (*Id.* ¶ 74.)

In all, Fries estimates that "the United States likely paid NextStep" over $21 million between 2016 and 2024 for kick-back surgeries involving the System. (*Id.* ¶ 73.) He now brings this qui tam action against NextStep and Theken under the False Claims Act. *(Id.* ¶¶ 1, 75-83.) The United States declined to intervene, and Defendants now seek to have it dismissed. (Doc. 43.)

## II. Discussion

"The False Claims Act targets just that—false claims." *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1285 (11th Cir. 2021). "It imposes liability on any person who, among other things, knowingly presents, or

causes to be presented, a false or fraudulent claim for payment or approval." *Vargas v. Lincare, Inc.*, 134 F.4th 1150, 1157 (11th Cir. 2025). To crack down on such fraud, the government "deputizes private individuals—known as relators—to bring suit on [its] behalf in what are called qui tam actions." *Id.* "If successful, the relator receives a share of the recovery." *Id.*

Defendants argue this case should be kicked for two reasons.[2] First, Fries lacks standing since he already released this claim when he settled his state-court employment action against NextStep. Second, they challenge the complaint as lacking plausibility and particularity.

The Court is not convinced of either defense. To the extent Fries' release covered this qui tam claim, the release is unenforceable since it was executed after this case was filed. The Court also finds no fatal problem with how the claim is pled. For organizational purposes, the Court divides its discussion into two parts: jurisdiction and the merits.

**a. Jurisdiction**

Article III of the Constitution limits federal jurisdiction to cases or controversies. U.S. Const. art. III, § 2. Among other things, this allows district courts to "hear a case only when the plaintiff has standing to sue."

[2] Insofar as Defendants also assert that the relator provision of the False Claims Act is unconstitutional, the Eleventh Circuit has not held otherwise. *See United States v. Fla. Med. Assocs., LLC*, No. 24-13581, 2026 WL 2581886 (11th Cir. Sept. 1, 2026).

*Baughcum v. Jackson*, 92 F.4th 1024, 1030 (11th Cir. 2024). To trigger standing, an individual plaintiff must have suffered an injury in fact, fairly traceable to the defendant, that the court can redress. *Berrocal v. Att'y Gen. of United States*, 136 F.4th 1043, 1049 (11th Cir. 2025). Absent any of these elements, subject matter jurisdiction is lacking. *E.g.*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

Federal Rule of Civil Procedure 12(b)(1) provides the vehicle for challenging a court's subject matter jurisdiction. *See Watson v. Kingdom of Saudi Arabia*, 159 F.4th 1234, 1252 (11th Cir. 2025). They come in two forms: "facial attacks" or "factual attacks." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Facial attacks require the court look only at the complaint to see whether the "plaintiff has sufficiently alleged a basis for subject matter jurisdiction." *Id.* at 1529; *see also Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260 (11th Cir. 1997).

"Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). "In resolving a factual attack, the district court may consider extrinsic evidence such as testimony and affidavits." *Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1258 (11th Cir. 2008). And the court is "free to weigh

[such] evidence" without presuming the complaint's truthfulness. *Id.*; *see also Lawrence*, 919 F.2d at 1529.

Defendants wage a factual attack on subject-matter jurisdiction. They lean on a 2024 settlement agreement with Fries that resolved a separate employment dispute. Fries signed that contract more than two years after he filed this case. The agreement broadly released all claims existing before the settlement. (Doc. 44-3 at 4-5.) But it also contained a carve-out for certain "protected activity." (*Id.* at 8.) As you might expect, Defendants insist that the release covers this qui tam claim, while Fries believes that the carve-out controls.

Either way, the case lives on. The FCA allows qui tam actions to be dismissed "*only* if the court *and Attorney General* give written consent to the dismissal[.]" 31 U.S.C. § 3730(b)(1) (emphasis added). Because the government retains this statutory veto power, most courts read the text to bar post-filing releases that attempt to unilaterally resolve a pending qui tam claim. *See U.S. ex rel. Charte v. Am. Tutor, Inc.*, 934 F.3d 346, 353 (3d Cir. 2019); *U.S. v. Purdue Pharma L.P.*, 600 F.3d 319, 326 (4th Cir. 2010) ("The FCA clearly provides that once a qui tam action is filed, the relator and the defendant may not settle (or at least may not voluntarily dismiss) the action."); *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 474 (5th Cir. 2009) ("The district court correctly found that [Relator] signed the release

eleven days after he filed the qui tam complaint and was therefore unable to personally dismiss the case."); *U.S. ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1168 (10th Cir. 2009) ("[Section 3730(b)(1)] only governs the enforceability of settlement agreements made after the filing of a quit tam claim."); *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 159 (5th Cir. 1997); *but see State Farm Mut. Auto. Ins. Co. v. Angelo*, 95 F.4th 419, 432 (6th Cir. 2024).

The Court finds that majority approach persuasive. After all, "qui tam claims belong to the Government, not to relators." *U.S. ex rel. Charte*, 934 F.3d at 353. "Even in cases where the government does not intervene," it maintains a firm grip over such actions and "remains a real party in interest." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1311 (11th Cir. 2021). So it's only right that a relator cannot unilaterally settle or release a claim never belonging to him in the first place. *See U.S. ex rel. Charte*, 934 F.3d at 353.

As mentioned, Fries executed the release with Defendants several years after filing this case. It follows that even if the release included qui tam claims, it stands unenforceable since the Attorney General has not provided written consent to this action's dismissal. *See United States ex rel. Lorona v. Infilaw Corp.*, No. 3:15-CV-959-J-34PDB, 2019 WL 3778389, at *10 n.14 (M.D. Fla. Aug. 12, 2019); *U.S. ex rel. Scott v. Cancio*, No. 8:10-CV-50-T-

30TGW, 2011 WL 5975782, at *2 (M.D. Fla. Nov. 28, 2011); *United States ex rel. Keeler v. Eisai, Inc.*, No. 09-22302-CIV, 2011 WL 13099033, at *3 (S.D. Fla. June 21, 2011) ("Here, the parties entered into the Release after Plaintiff filed his qui tam claims. Federal courts across the country have held that general releases that are entered into after the filing of a qui tam action are unenforceable."). Fries thus has standing, and the Court has subject-matter jurisdiction over the qiu tam claim. *United States ex rel. Class v. Bayada Home Health Care, Inc.*, No. CV 16-680, 2018 WL 4566157, at *4 (E.D. Pa. Sept. 24, 2018); *U.S. ex rel. Nowak v. Medtronic, Inc.*, 806 F. Supp. 2d 310, 336 (D. Mass. 2011); *U.S. ex rel. Davis v. Lockheed Martin Corp.*, No. 4:09-CV-645-Y, 2010 WL 4607411 (N.D. Tex. Nov. 15, 2010).

One last thing. The parties never argued this timing issue. But federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006). Because the release's enforceability goes directly to the Court's power to hear the case, we can raise and resolve the question sua sponte. *See Hakki v. Sec'y, Dep't of Veterans Affs.*, 7 F.4th 1012, 1023 (11th Cir. 2021); *Giammarinaro v. Astrue*, No. 8:12-CV-2167-T-EAJ, 2013 WL 12157304, at *2 (M.D. Fla. Feb. 5, 2013).

**b. The Merits**

Now for the claim itself. Defendants maintain that it is plagued by plausibility and particularity problems. The Court disagrees on both fronts and lays out the broader legal standard before tackling each argument in turn.

**i. Legal Standard**

To survive a motion to dismiss, "a complaint must contain sufficient facts, accepted as true, to state a facially plausible claim for relief." *Galette v. Goodell*, No. 23-10896, 2023 WL 7391697, at *3 (11th Cir. Nov. 8, 2023). "A claim is facially plausible if it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When reviewing a motion to dismiss, we must accept all factual allegations in the complaint as true and view the facts in the light most favorable to the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

And since Fries' FCA claim sounds in fraud, it must also satisfy Federal Rule of Civil Procedure 9(b)'s" heightened pleading standard." *United States ex rel Sedona Partners LLC v. Able Moving & Storage Inc.*, 146 F.4th 1032, 1040 (11th Cir. 2025).

**ii. Plausibility**

"A claim is facially plausible where the facts alleged permit the court to reasonably infer that the defendant's alleged misconduct was unlawful." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015). "While the plausibility standard is not akin to a probability requirement, it still asks for more than a sheer possibility that a defendant has acted unlawfully." *Holland v. Carnival Corp.*, 50 F.4th 1088, 1093 (11th Cir. 2022). Determining a claim's plausibility is thus "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense in reviewing the plaintiff's allegations." *Iqbal*, 556 U.S. at 679.

Defendants paint Fries' claim as implausible for two reasons. First, its "premise is chronologically implausible" since the surgeons signed their royalty deals three years before the System was cleared for sale. (Doc. 43 at 22.) It is thus "impossible," Defendants claim, that a volume-based royalty deal could've been arranged so far in advance. (*Id.*)

The Court is not so sure. For one, Fries only alleges that NextStep created its Surgeon-Consultant team "[s]tarting in mid-2013." (Doc. 35 ¶ 48.)

He doesn't say the team was complete in 2013. Nor does he suggest that all royalty agreements were struck that year. So the complaint doesn't necessarily allege that every surgeon had entered the scheme so early on. But even if it did, it still wouldn't matter. Playing the long game is hardly a mind-boggling endeavor. The Court thus does not find it unfathomable that this arrangement could have been years in the making.

Defendants next contend that the royalty deals fall squarely within the Anti-Kickback Statute's safe harbor provision. Specifically, they rely on the "personal services and management contracts" provision "which immunizes against prosecution those who meet all of seven specific standards." *United States v. McCardell*, 750 F. App'x 314, 319 (5th Cir. 2018); *see also* 42 C.F.R. § 1001.952(d). Key here, that provision requires "[t]he methodology for determining compensation to the agent [not be] determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties." § 1001.952(d)(iv).

To be sure, the outward terms of the royalty deals check this box. But Fries says that was all a front. He alleges that each deal's royalty rates were instead according to the amount of business each surgeon was expected to bring in. "This is a plausible assertion which, if true, would take [NextStep's] payments outside the safe harbor"—regardless of the deals' on-paper disclaimers. *United States v. Medtronic PLC*, No. 217CV01903ODWSSX,

2022 WL 541604, at *7 (C.D. Cal. Feb. 23, 2022). So at this stage, Fries' claim survives. *See United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 653 (N.D. Tex. 2020); *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 669 (S.D. Tex. 2013).

**iii. Particularity**

As mentioned, claims sounding in fraud are subject to Rule 9(b)'s particularity requirement. This requires relators to identify the who, what, when, where, and how of the alleged fraud. *Gose v. Native Am. Servs. Copr.*, 109 F.4th 1297, 1306-07 (11th Cir. 2024). It also demands "some indicia of reliability to support the allegation of an actual false claim for payment being made to the government." *Olhausen v. Arriva Med., LLC*, 124 F.4th 851, 861 (11th Cir. 2024).

There is more than one way to clear Rule 9(b). Relators can provide "billing data or a representative sample claim proving that allegedly false claims were actually submitted." *Id.* Or they can stand on "direct, first-hand knowledge" of the fraud that they "gained through their employment with the defendant[.]" *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014); *see also U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012); *United States v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005). Either way, a complaint's reliability is judged "on a case-by-case basis" and is entirely

context-driven. *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006); *Vargas*, 134 F.4th at 1157.

Fries' complaint is up to snuff. It outlines an eight-year-long scheme designed to pay surgeons depending on how many NextStep devices they used in their surgeries. It namedrops the executives and surgeons involved in the scheme and provides precise figures of each surgeons' yearly kickbacks. (Doc. 35 ¶ 63.) And, to top things off, it offers a handful of representative samples stocked with the specific dates and amounts surgeons submitted false bills to Medicare. (*Id.* ¶ 71); *see United States v. BioTek Labs, LLC*, No. 8:18-CV-2915-WFJ-JSS, 2023 WL 374334, at *3 (M.D. Fla. Jan. 24, 2023); *cf. U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1311-12 (11th Cir. 2002) (concluding relator's allegations fell short absent allegations of if or when "any actual improper claims were submitted to the Government.")

To be sure, the complaint doesn't identify where the fraudulent conduct occurred. But courts "are more tolerant toward complaints that leave out some particularities of a false claim if the complaint also alleges personal knowledge or participation in the fraud[.]" *U.S. ex rel. Matheny*, 671 F.3d at 1230. That is what we have here.

Fries claims to have "direct and independent knowledge" of the scheme given his former post as NextStep's Vice President. (Doc. 35 ¶¶ 5, 14.) He explains that he began that job around the same time the scheme was first

formed and held it for the next seven years. (*Id.*) Through that role, he claims to have provided NextStep "various executive services including sales, product development, and"—perhaps most crucially—managing the surgeon consultants. (*Id.* ¶ 5.) He thus appears to have had a front-row seat to the alleged kickback scheme. *R&F Properties of Lake County, Inc.*, 433 F.3d at 1360. Taken together, his complaint alleges enough indicia of reliability to pass muster. *See Olhausen*, 124 F.4th at 866 (deeming the details of defendant's false claims, "combined with the indicia of reliability that [Relator's basis for knowledge provide[d]" was "enough to survive Rule 9(b)'s particularity standard"); *U.S. ex rel. Mastej*, 591 F. App'x at 709.

Still, Defendants stress that the representative examples come from too small a sample size to sustain the alleged scope of the scheme. They point out that the five examples offered involve only four surgeons and occurred over a ten-month span. But "where the fraud occurred over an extended period of time and consisted of numerous acts, the specificity requirements are applied less stringently." *U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 198 F.R.D. 560, 562 (N.D. Ga. 2000). Absent controlling caselaw to the contrary, there is simply "no basis for holding that the failure to allege examples over the entire span of an alleged fraudulent scheme requires dismissal of claims supported by otherwise representative" and sufficiently pled examples. *United States v. Curo Health Servs. Holdings, Inc.*, No. 3:13-CV-00672, 2022

WL 842937, at *11 (M.D. Tenn. Mar. 21, 2022). Fries' representative samples thus suffice. *See BioTek Labs, LLC*, 2023 WL 374334, at *3.

Defendants further contend that the complaint does not sufficiently tie Theken to the scheme, and so he should be dismissed from the case. As Defendants note, fraud claims cannot lump someone into an illicit scheme without specific allegations of that defendant's fraudulent conduct. *See, e.g.*, *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007). But Fries clears this bar too.

He alleges that Theken met with a surgeon-consultant, Dr. Gittins, sometime between mid-2016 and November of that year "multiple times" after learning Gittins "was not pleased with NextStep's instruments or the sales team assigned to him." (Doc. 35 ¶ 53.) Theken allegedly offered to raise Gittins' royalty percentage and ultimately did so to the tune of 1.25%. (*Id.*) Gittins later performed surgeries using NextStep devices and submitted corresponding claims to Medicare. (*Id.* ¶ 71iii.) Further, Fries supplies these claims' amounts and dates. (*Id.*) Fries thus identifies in pretty granular detail Theken's involvement in the scheme. He therefore cannot escape this action just yet.

## IV. Conclusion

In sum, Fries' release doesn't deprive this Court of subject-matter jurisdiction. And his claim is pled with enough plausibility and particularity

to proceed to discovery. Defendants' Motion to Dismiss (Doc. 43) is therefore **DENIED**.

**ORDERED** in Fort Myers, Florida on September 11, 2026.

Kyle C. Dudek
United States District Judge